UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

05 Civ. 00061

In re AtheroGenics Securities Litigation

**MEMORANDUM**
**OPINION AND ORDER**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendants AtheroGenics, Inc. ("AtheroGenics"), Michael Henos, Russell Medford,

Mark Colonnese, Robert Scott, and Martin Wasserman) (the "individual defendants," and

together with AtheroGenics collectively, "defendants"), have moved pursuant to 28 U.S.C. §

1404(a) to transfer this federal securities class action to the United States Court for the

Northern District of Georgia. For the reasons set forth below, the motion is granted.

**BACKGROUND**

Six putative class action complaints have been filed against defendants in this matter:

two in the Southern District of New York,[1] which were consolidated as the above-captioned

action by order of this Court on April 18, 2005, and four in the Northern District of Georgia,[2]

---

[1] *Andrada v. Atherogenics, Inc., et al.* (No. 05 Civ. 00061), filed on January 5, 2005; *Faulkner v. Atherogenics, Inc., et al*. (No. 05 Civ. 01938), filed on February 8, 2005. The memorandum opinion and order consolidating these actions also appointed the Billings Group as lead plaintiff and designated Milberg Weiss Bershad & Schulman LLP, Chitwood & Harley, and Dyer & Shuman LLP as co-lead counsel. *Andrada v. Atherogenics, Inc*., 2005 WL 912359 (S.D.N.Y. Apr. 19, 2005).
[2]*Bassett v. Atherogenics, Inc. et al.* (No. 05 Civ. 00070), filed on January 7, 2005; *Corson v. Atherogenics, Inc. et al.* (No. 05 Civ. 00082), filed on January 10, 2005; *Brahmbhatt v. Atherogenics, Inc., et al.* (No. 05 Civ. 00096), filed on January 11, 2005; *Christian United Fellowship v. Atherogenics, Inc. et al.* (No. 05 Civ. 00211), filed on January 25, 2005.

1

which plaintiffs voluntarily dismissed on July 14, 2005 following the filing of the instant

motion.

The actions charge that defendants violated federal securities laws by issuing a series

of materially false and misleading statements between September 28, 2004 and December 31,

2004 regarding the clinical trial results of a drug developed by AtheroGenics, a Georgia-based

pharmaceutical research company. The plaintiffs allege that these false statements regarding

the drug's potential to treat coronary artery disease had the effect of artificially inflating the

market price of AtheroGenics's securities in violation of Section 10(b) of the Securities

Exchange Act of 1934, and Rule 10b-5 promulgated thereunder; they further allege that the

individual defendants are liable as controlling persons of AtheroGenics under Section 20(a) of

the Exchange Act.

According to the complaint,[3] AtheroGenics is a research-based pharmaceutical

company, focused on the discovery, development and commercialization of novel drugs for

the treatment of chronic inflammatory diseases, including heart disease or atherosclerosis.

(Compl. ¶ 2.) AtheroGenics's AGI-1067 drug was developed and designed to treat

atherosclerosis of the blood vessels of the heart, or coronary artery disease, in a manner that

existing therapy could not. (*Id*. at ¶ 3.) On September 27, 2004, after the markets closed,

defendants issued a press release entitled "AtheroGenics Announces Positive Interim Results

from CART-2 Study—Data Show Highly Statistically Significant Plaque Regression with

AGI-1067 in One-Year Study." (Id. at ¶ 24.) The release reported positive preliminary results

regarding the drug's ability to reduce the plaque volume associated with coronary

atherosclerosis. (*Id*.) It also announced that these interim results were analyzed by Jean-

---

[3] A consolidated amended complaint has not yet been filed in this action. Citations are to the
Faulkner complaint unless otherwise noted.

Claude Tardif, M.D. at the Montreal Heart Institute in Montreal and by Steven Nissen, M.D. at the Cleveland Clinic Foundation in Ohio. (*Id.*)

Following this preliminary report, defendants issued another release on November 22, 2004 entitled "AtheroGenics Reports Positive Final Results from CART-2 Clinical Trial of AGI-1067— AGI-1067 Achieves Statistically Significant Plaque Regression Versus Baseline." (*Id.* at ¶ 25.) The release noted positive final data from the CART-2 study. (*Id.*) That same day,[4] defendants issued a second release with regard to another planned study of the drug, the Phase III ARISE trial, entitled "AtheroGenics Reaches Original Enrollment Target of 4,000 Patients in ARISE Phase III Clinical Trial of AGI-1067—Company Reiterates Plan to Extend Enrollment." In the release, defendants indicated the desire to continue enrollment so "as to accelerate the accumulation of patient years of exposure to the drug." (*Id.*) Following these November 22 announcements, AtheroGenics' stock price fell by 15%. (Andrada Compl. at ¶ 30.)

On January 3, 2005, AtheroGenics announced in another release it had decided to increase the number of patients in the Phase III study, that the study would be longer in duration, and that proposed amendments to the Food and Drug Administration regarding the study would be needed (*Id*. at ¶¶ 9, 28.) This news, according to the complaint, caused AtheroGenics's stock to fall 20%. (*Id*. at ¶ 9.) Two days later, defendants disclosed that the SEC and the NASD had both opened informal inquiries "related to our September 27, 2004 announcement of interim results from the CART-2 trial for AGI-1067." (Declaration of Jeffery A. Berens, Esq. ("Berens Decl."), Ex. N at 22 (excerpts from AtheroGenics's SEC Form 10-K for fiscal year 2004).

---

[4] The Andrada complaint gives November 23 as the date of this release. (Andrada Compl. ¶ 31.)

According to plaintiffs, defendants were aware on or prior to September 27, 2004 of troubling aspects of the Phase IIb trial that would impact both the final results of the trial and the appropriate execution of the ARISE Phase III trial, yet obscured this knowledge and released false information to the market. (Compl. at ¶ 5.) Plaintiffs assert defendants were made aware of further study-related problems in November 2004 that they concealed, and that the releases of November 22, 2004 were also false and misleading. (*Id.* at ¶¶ 6-8.)

**DISCUSSION**

Section 1404(a) of Title 28 of the United States Code provides that: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. 1404(a) (2000). The purpose of this Section is to "prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 2005 WL 1994017, at *2 (S.D.N.Y. Aug. 17, 2005).

The "preliminary inquiry is whether the action sought to be transferred is one that might have been brought in the transferee court." *Cavu Releasing, LLC. v. Fries*, --- F.Supp.2d ----, 2005 WL 1944269 at *5-6 (S.D.N.Y. Aug. 12, 2005); *Mattel, Inc. v. Robarb's, Inc.*, 139 F. Supp. 2d 487, 490 (S.D.N.Y. 2001) (internal citations omitted). The Exchange Act provides for venue in any district "wherein the defendant is found or is an inhabitant or transacts business." 14 U.S.C. § 78aa. Here, the parties do not dispute that the Northern District of Georgia is a district where the action might have originally been brought; indeed, four similar actions were so filed in early 2005. *See* Lead Pls.' Mem. at 8 n.6.

Once a defendant meets that threshold determination regarding the transferee district, courts will further examine factors such as: (1) the place where the operative facts occurred; (2) the convenience of the parties; (3) the convenience of witnesses; (4) the relative ease of access to sources of proof; (5) the availability of process to compel attendance of unwilling witnesses; (6) the plaintiff's choice of forum; (7) the forum's familiarity with governing law; and (8) trial efficiency and the interests of justice. *Linzer v. EMI Blackwood Music, Inc*., 904 F. Supp. 207, 216 (S.D.N.Y. 1996) (citing cases). The burden of demonstrating the desirability of transfer will lie "with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum 'unless the defendants make a clear and convincing showing that the balance of convenience favors defendants' choice." *Id*. (quoting *Hubbell Inc. v. Pass & Seymore, Inc*., 883 F.Supp. 955, 962 (S.D.N.Y. 1995)). Ultimately, "motions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *In re Cuyahoga Equipment Corp*., 980 F.2d 110, 117 (2d Cir. 1992) (internal citations omitted).

While there is "no *per se* rule requiring or presumptively favoring the transfer of a securities-fraud action to the district where the issuer is headquartered," such transfers to the issuer's home district are routine "as a practical matter." *In re Hanger Orthopedic Group, Inc. Sec. Litig*., --- F.Supp.2d ----, 2006 WL 466485, at *3 (E.D.N.Y. Feb. 28, 2006 (collecting cases). Although the plaintiffs in the four Georgia actions voluntarily dismissed those cases in the days following the filing of the instant motion in this action, courts have also noted that "[t]ransfer seems especially appropriate where, as here, there are previously filed actions pending in the defendants' home district." *Langley Partners, L.P. v. Tripath Tech., Inc*., 2005 WL 2482527 at *2 (S.D.N.Y. Oct. 6, 2005) (citing *Berman v. Informix*

*Corp*., 30 F.Supp.2d 653 (S.D.N.Y. 1998) and *MBCP Peerlogic, L.L.C. v. Critical Path, Inc*.,

2002 WL 31729626, at *2 (S.D.N.Y. Dec. 5, 2002).)  Here, application of the relevant factors

reveals that defendants have met their burden to transfer this action under § 1404(a).

*Lead plaintiffs' choice of forum*

A plaintiff's choice of forum "is generally entitled to considerable weight and should

not be disturbed unless the balance of the factors is strongly in favor of the defendant."

*Berman v. Informix Corp*., 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998); *see also Goggins v.*

*Alliance Capital Management, L.P*., 279 F. Supp. 2d 228, 232 (S.D.N.Y. 2003) (plaintiff's

forum choice "is generally accorded more deference" in circumstances where "there is a

material connection or significant contact between the forum state and the underlying events

allegedly underlying the claim").

However, "[w]hile it is axiomatic that a plaintiff's choice of forum is entitled to great

consideration, the adage has little weight in stockholder class actions."  *Shulof v.*

*Westinghouse Elec. Corp*., 402 F.Supp. 1262, 1263 (S.D.N.Y. 1975); *see also Lewis v. C.R.I.,*

*Inc*., 2003 WL 1900859, at *5 (S.D.N.Y. Apr. 17, 2003) (collecting cases, and noting that

"cases interpreting section 1404(a) have found that representative plaintiffs … are entitled to

less deference than other plaintiffs."); *Eichenholtz v. Brennan*, 677 F.Supp. 198, 202

(S.D.N.Y. 1988) (in a class action under federal securities laws there will be "numerous

potential plaintiffs, each possibly able to make a showing that a particular forum is best suited

for the adjudication of the class's claim" and thus less deference to forum choice is

appropriate).  Thus, in light of the nature of this action, lead plaintiffs' preference for this

forum will be accorded only moderate weight, and the below factors will rise in relative

significance.  *Goggins*, 279 F.Supp.2d at 232.

*Locus of operative facts*

In securities fraud actions, "[m]isrepresentations and omissions are deemed to 'occur'

in the district where they are transmitted or withheld, not where they are received." *In re*

*Nematron Corp. Sec. Litig.*, 30 F. Supp. 2d 397, 404 (S.D.N.Y. 1998) (quoting *Purcell*

*Graham, Inc. v. National Bank of Detroit*, 1994 WL 584550, at *4 (S.D.N.Y. Oct. 24, 1994).

As defendants point out, AtheroGenics headquarters in Alpharetta, Georgia is at the factual

center of this case, and the locus of all relevant decisionmaking.  At issue here is the conduct

of the defendant corporation and the individual defendants with respect to the disclosures

made in the fall of 2004 about the prospects of the new atherosclerosis drug; the press releases

and public filings relating to those clinical trials at issue were prepared in Alpharetta.

(Declaration of Mark P. Colonnese ("Colonnese Decl.") ¶ 12.)

While the CART-2 trial itself took place in Canada (Berens Decl., Exs. B, C), and the

Phase III ARISE trial was to be conducted at various locations in North America, the United

Kingdom, and South Africa (Berens Decl., Ex. E), the results of the trials were reported to

executives and scientists employed by AtheroGenics at its corporate headquarters in Georgia.

(Colonnese Decl. ¶ 11.)  Furthermore, the decision to conduct the interim analysis itself was

made in Alpharetta by the Executive Committee of ArtheroGenics.  (Supplemental

Declaration of Mark. P. Colonnese ("Supp. Colonnese Decl.") ¶ 9.)  Aside from the sale and

purchase of Atherogenics stock by putative class members, the dissemination of the press

releases, and two study-related New York appearances by defendant CEO Medford,[5] there are

---

[5] On September 28, 2004, Russell Medford, AtheroGenics' CEO, appeared at CNBC's studios
in midtown Manhattan for a taping of "Morning Call" regarding the announcement of the
Phase IIb interim findings; the same day, he gave a presentation on the results at Grand Hyatt
in New York City for the UBS Global Life Sciences Conference. (Berens Decl., Exs. H, J.)

no facts tying this action here that would warrant ignoring Georgia's "intimate connection to

the events underpinning this case" and its status as the locus of the alleged fraud. *In re*

*Nematron*, 30 F.Supp. at 404; *see also Ravenwoods Invest. Co., L.P. v. Bishop Capital Corp.*,

2005 WL 236440, at *6 (S.D.N.Y. Feb. 1, 2005) ("The trading and holding of stock in New

York is not, however, a significant contact with the *operative* facts of this action.").

*Convenience of the parties and witnesses*

All of the individual defendants in this matter are located in the Northern District of

Georgia (Colonnese Decl. ¶¶5-9). Defendants have also identified by name at least five

potential non-party witnesses who are located in the Atlanta area, and have pointed to eight

other potential witnesses in the Northern District who were employed by or on the board of

defendant at the requisite time. (Supp. Colonnese Decl. ¶¶4.) "The convenience of non-party

witnesses is usually the most important factor to consider in deciding whether to depart from

the plaintiff's choice of forum." *In re Hanger Orthopedic Group, Inc. Sec. Litig.*, 2006 WL

466485, at *3. Few witnesses with knowledge probative of the alleged fraud are located in

New York,[6] and the three potential witnesses involved in the examination of the drug in

Canada and Cleveland (Drs. Tardif, Topol, and Nissan) are a flight's distance from both New

York City and Atlanta. *See, e.g., Canadian Kennel Club v. Continental Kennel Club*, 1997

WL 361991, at *3-4, n.3 (S.D.N.Y. June 30, 1997) (finding that Canadian party witness "will

---

On December 1, 2004, Defendant Medford made an oral presentation on the Phase III ARISE
study at the Lazard Life Sciences Conference at the Mandarin Oriental Hotel in New York
City. (Compl. ¶ 27; Berens Decl., Ex. L.)
[6] Lead plaintiffs do note the fact that defendant retains a New York City based public
relations firm to disseminate its news releases, and that analysts from Wachovia Securities,
Needham & Company, Morgan Stanley, and Fortis Bank issued reports on defendant during
the class period; these companies on "information and belief … [each maintain] a primary
office in New York." (Berens Decl. at ¶ 2.)

have to travel to any trial of this action whether it is adjudicated in New York or Louisiana," that "either way, travel is required, and the difference in travel time [of flying to transferee district] does not significantly affect the balance"); *see also Wechsler v. Macke Int'l Trade, Inc.*, 1999 WL 1261251, at \*6 (S.D.N.Y. Dec. 27, 1999) ("[T]he Court dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums."); *Telecom Technical Services, Inc. v. ROLM Co.*, 1995 WL 874441 (E.D.Tex. Feb. 24, 1995) (noting that "it is well known that Atlanta is a major transportation hub of the Southeast" in transferring case to Northern District of Georgia in part because of convenience to counsel, parties, and witnesses).

While lead plaintiffs, despite their lack of residence in this district,[7] have expressed a preference for litigating this matter in New York City, they also moved for appointment as lead plaintiff and lead counsel in the actions filed in Georgia. Although lead plaintiffs are under no burden on a motion to transfer, such efforts counsel against a finding of countervailing inconvenience regarding the resumption of litigation of this matter in that district. Considering the location of both party and non-party witnesses, "on balance, transfer would be significantly more convenient for the defendant and not substantially disadvantageous to plaintiff." *Intria Corp. v. Intira Corp.*, 2000 WL 1745043, \*4 (S.D.N.Y. Nov. 27, 2000) (noting disruption and expense likely incurred by California business if trial were to proceed in New York.) This factor, therefore, resolves in favor of transfer.

---

[7] One lead plaintiff resides in Brooklyn, New York (Michele Fortunato); the others reside in Fairfax, Virginia (Andrew May), and Naples, Florida (Robert and Michele Billings). (Berens Decl. at ¶ 3.)

*Location of Documents and Ease of Access to Sources of Proof*

The location of documents in this matter also weighs in favor of transfer. Defendants have noted that correspondence among employees and executives, communications and documents related to the disputed press releases and financial reports, and the "voluminous documentation" surrounding the AGI-1067 clinical trials, among other documentation, are available in defendant's sole office in Alpharetta. "This factor is clearly an important consideration in motions to transfer pursuant to 28 U.S.C. § 1404(a)." *Aquatic Amusement Assoc., Ltd. v. Walt Disney World Co.*, 734 F.Supp. 54, 58 (N.D.N.Y. 1990).

While "[o]f course the documents at issue here could be copied and shipped to New York … this would impose an extra cost that is unnecessary." *Nematron Corp.*, 30 F.Supp.2d at 404; *see also Ravenwoods Invest. Co., L.P.*, 2005 WL 236440 at *6; *Stillwater Mining*, 2003 WL 21087953, at *5 (S.D.N.Y. May 12, 2003) ("While it is true that documents can be transported from state to state, for purposes of weighing transfer factors, the fact that the documents are all currently located in [the transferee district] favors transfer."). Accordingly, transfer will facilitate access to the relevant documents and records.

*Additional factors*

It is obvious that the federal courts in both this district and the Northern District of Georgia are familiar with the legal principles necessary to resolve this case. This factor, therefore, does not favor either party. The parties also concede, more or less, that the relative means of the parties does not strongly favor either lead plaintiffs or defendants. (*See* Lead Pls.' Mem. at 20-21.) In terms of relative docket congestion, the Court notes that, as of September 30, 2005, the number of pending cases (civil and criminal) per active judge in the

Southern District of New York was 689; in the Northern District of Georgia, it was 354. See

Administrative Office of the United States Courts, Federal Court Management Statistics

("FCMS"), *available at* http://www.uscourts.gov/cgi-bin/cmsd2005.pl (last visited Mar. 29,

2006); *see In re Hanger Orthopedic Group*, 2006 WL 466485, at \*5 (transferring case to

District of Maryland and citing the FCMS database for comparative caseloads while noting

that "although docket congestion is insufficient on its own to support a transfer motion [it is] a

proper factor for the Court to consider and is accorded some weight") (internal quotations

omitted).

*Conclusion*

Based on the foregoing analysis, the Court concludes that the balance of factors

clearly favors transfer. Defendants' motion to transfer this action [21] to the Northern District

of Georgia is granted, and the Clerk of the Court is directed to effectuate the transfer.

SO ORDERED

Dated: New York, New York
March 31, 2006

Richard J. Holwell
United States District Judge

11